## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Case No. 24-cv-2519

INTEGRITY SOLUTIONS, LTD.,

      Plaintiff,

  v.

MCS Consulting, Inc., Energy Systems
Consulting, LLC, Makers Solutions, LLC,
Geo-Prime, LLC, companies, Meagan
Cumberland, Joel Lindstrom, Kyle Mader,
individuals,

      Defendants.

---

## PLAINTIFF INTEGRITY SOLUTIONS, LTD.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING ENTRY OF A PRELIMINARY INJUNCTION

---

{08531529 / 5}}

## I.    <u>INTRODUCTION</u>

Pursuant to Fed. R. Civ. P. 65 and L.R.Civ.P. 65.1(a), Plaintiff Integrity Solutions, Ltd. ("Integrity" or "Plaintiff"), hereby submits this Memorandum of Points and Authorities in support of its *ex parte* Application for a Temporary Restraining Order ("TRO") against defendants MCS Consulting, Inc., Makers Solutions, LLC, Energy Systems Consulting, LLC, Geo-Prime, LLC, Meagan Cumberland, Joel Lindstrom, and Kyle Mader (collectively, "Defendants"). Plaintiff respectfully requests that this Court issue an order temporarily enjoining Defendants from:

    (1)    Soliciting Plaintiff's oil and gas pipeline operator clients and their business;

    (2)    Making use of any of Plaintiff's Confidential and Proprietary Technology and Trade Secrets;

    (3)    Distributing or disclosing any of Plaintiff's Confidential and Proprietary Technology and Trade Secrets to any third party;

    (4)    Selling any product or offering any service derived in whole or in part from Plaintiff's Confidential and Proprietary Technology, Trade Secrets, and Work Product, including Plaintiff's software, tools, and applications to any third party;

Plaintiff further requests that this Court issue an Order to Show Cause as to why a Preliminary Injunction should not be entered under the circumstances, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

## II.    <u>FACTUAL BACKGROUND</u>

### A.    *Plaintiff's Proprietary Materials and Technology*

Plaintiff Integrity Solutions, Ltd. was founded in 2006 and provides management services and software solutions to the United States oil and gas pipeline industry. (Verified Complaint, ¶¶19-51.) Integrity assists pipeline operators with pipeline regulatory compliance, risk management, and pipeline integrity analysis, including generating asset integrity reports required by regulators. (*Id.* at ¶¶21-22.) To that end, Integrity created and developed some of the first industry-leading pipeline facility risk models and integrity analysis software suites, applications, and database tools. (*Id.* at ¶¶24 and 29.) These models, software suites, applications, and tools are Plaintiff's Confidential and Proprietary Technology and include Plaintiff's trade secrets. (*Id.* at ¶30.) Plaintiff collects and integrates client data into its Confidential and Proprietary Technology, including client performance and inspection data into its models, software suites, applications and tools ("Trade Secrets"). (*Id.* at ¶32.)

Plaintiff's Confidential and Proprietary Technology and Trade Secrets include: (1) a liquid or gas release consequence analysis software platform for evaluating High Consequence Areas for pipeline operators ("HCA Software"); (2) an overall risk assessment software platform referred to as the Pipeline and Facility Integrity Manager$^{TM}$ ("PFIM Software"); (3) a data collection application and tool referred to as the Anomaly Data Manager$^{TM}$ ("ADM Tool"); (4) a data analysis and data integration application and tool referred to as the Seam Anomaly & Fatigue Exposure Susceptibility & Engineering Analysis Manager$^{TM}$ ("SafeSeam Tool"); and (5) Plaintiff's list of customers including those listed in its activation database. (*Id.* at ¶¶33-44.)

Plaintiff has been developing and improving its Confidential and Proprietary Technology and Trade Secrets since the start of the company nearly 20 years ago. (*Id.* at ¶31.) Plaintiff has invested significant resources into creating, maintaining, and updating its Confidential and

Proprietary Technology and Trade Secrets, and indeed, much of primary consulting services for customers and clients would not be possible without them. (*Id.* at ¶¶45-50.) Plaintiff's exclusive use of its Confidential and Proprietary Technology and Trade Secrets are essential to Plaintiff's continued operation.

**B.**    ***Defendants' Relationship with Plaintiff***

Defendants MCS Consulting, Inc., Energy Systems Consulting, LLC, and Makers Solutions, LLC, ("Independent Contractor Entities") are companies formed by independent contractor Defendants Meagan Cumberland, Joel Lindstrom, and Kyle Mader ("Individuals"), respectively. (*Id.* at ¶¶54, 62, and 68.) Ms. Cumberland, through her Independent Contractor Entity MCS Consulting, Inc., was contracted by Integrity as a "Practice Manager" to manage work in Plaintiff's pipeline integrity management practice. (*Id.* at ¶¶52-57.)

Mr. Mader, through his Independent Contractor Entity Makers Solutions, LLC, was contracted by Integrity as a "Senior Project Manager" to manage all non-Project Manager engineers in Plaintiff's integrity management practice and reported directly to Ms. Cumberland. (*Id.* at ¶¶60-63.)

Mr. Lindstrom, through his Independent Contractor Entity Energy Systems Consulting, LLC, was contracted by Integrity as a desktop application and geographic information system (GIS) programmer. (*Id.* at ¶¶67-69.) Mr. Lindstrom's role with Integrity included developing Plaintiff's software in the GIS environment, and updating the PFIM Software and the ADM Tool, including incorporation of software licensing for the PFIM Software. (*Id.* at ¶70.)

**C.**    ***Defendants' Contractual Obligations***

Each of Ms. Cumberland, Mr. Mader, and Mr. Lindstrom had regular access to Integrity's

Confidential and Proprietary Technology and Trade Secrets, including HCA, PFIM, ADM, and SafeSeam. (*Id.* at ¶¶58, 64, and 71.) With that in mind, Ms. Cumberland, Mr. Mader, and Mr. Lindstrom, through their respective Independent Contractor Entities, were bound by certain contractual provisions in each of their Subcontractor Master Services Agreements ("Agreement"). (*Id.* at ¶87; Exs. A, C, and E.)

Defendants: (i) agreed not to disclose or use Plaintiff's trade secrets (Agreement, Section 3.01); (ii) provided additional assurances they would not disclose or use Plaintiff's trade secrets (Agreement, Section 4.01); (iii) agreed not to compete with Plaintiff (Agreement, Section 3.04); (iv) agreed not to solicit Plaintiff's customers (Agreement, Section 3.05); (v) agreed to keep Plaintiff's data confidential (Agreement Section 4.02); (vi) agreed to return Plaintiff's confidential and proprietary information (Agreement, Section 4.03); and (vii) agreed to a temporary restraining order, temporary injunction and permanent injunction, and liquidated damages in the event of a breach of their obligations to Plaintiff (Agreement, Section 5.01). (*Id.* at ¶¶88-94.)

### D.    *Defendants' Breached Their Obligations to Plaintiff*

Ms. Cumberland's last day with Plaintiff was December 31, 2023, and her exit interview was held on January 4, 2024. (Verified Complaint, at ¶55.) Likewise, Mr. Mader's and Mr. Lindstrom's last day with Plaintiff was July 5, 2024, and their respective exit interviews were held on that day. (*Id.* at ¶¶65, 72 and 100.) Just over two months after Ms. Cumberland left Integrity, in March 2024, a new entity named Geo-Prime, LLC was registered with the Texas Secretary of State, with Ms. Cumberland's home address listed as its official mailing address. (*Id.* at ¶79.) Then, just after Mr. Mader and Mr. Lindstrom left Plaintiff, in early July 2024 Ms.

Cumberland, Mr. Mader, and Mr. Lindstrom announced the launch of their new venture, Geo-Prime, LLC, purporting to offer, mere weeks after its creation as a company, the same complex pipeline integrity services for which Integrity spent *years* developing proprietary software, tools, and applications. (*Id.* at ¶¶74-78, 81-82, and 84.) Defendant Geo-Prime lists Joel Lindstrom, Kyle Mader, and Meagan Cumberland as its 'Leading Experts' on Geo-Prime's website, located at https://www.geo-prime.net/about-copy. (*Id.* at ¶86.) Furthermore, Ms. Cumberland lists herself as a "Principal and Senior Consultant" at Geo-Prime, Mr. Mader lists himself as a "Senior Pipeline Consultant" at Geo-Prime, and Mr. Lindstrom lists himself as a "Principal and Senior Consultant" at Geo-Prime. (*Id.* at ¶¶80, 83, and 85.)

Shortly after Ms. Cumberland, Mr. Mader, and Mr. Lindstrom launched Geo-Prime, on Tuesday, July 23, 2024, Integrity received an e-mail from one of Integrity's clients, Sentinel Midstream LLC. (*Id.* at ¶101-104; Ex. F.) This e-mail was inexplicably addressed to *Ms. Cumberland's* old Integrity Solutions e-mail address, Meagan.cumberland@integritysolutionsltd.com, and included Integrity's own confidential project estimates for Sentinel Midstream (amounting to **$598,575**) which were created by Integrity for Sentinel Midstream *after* Ms. Cumberland left Integrity. (*Id.* at ¶¶101, 105-109.) Tellingly, without any explanation, Sentinel Midstream attempted to 'recall' the e-mail shortly after it was sent to Integrity. (*Id.* at ¶110; Ex. G.)

Shortly after discovering this suspicious July 23rd e-mail and given Geo-Prime's unusually rapid 'development' of software-based capabilities that took Integrity years to develop from scratch, Integrity began investigating Defendants' download activities in the weeks leading up to their departures. (*Id.* at ¶116.) Integrity was troubled to discover that in the weeks and days

leading up to their departures, Defendants accessed, reviewed, and downloaded thousands of Integrity's files, as well as Confidential and Proprietary Technology and Trade Secret material belonging to Plaintiff, including the HCA Software, the PFIM Software, the ADM Tool, the SafeSeam Tool, and Plaintiff's license activation database. (*Id.* at ¶¶117-167.)

Indeed, some of Defendants' downloads occurred well after Defendants had either already terminated their contracts or gave Plaintiff notice that they were terminating their contracts. (*Id.* at ¶166.) These unauthorized downloads of Integrity's Confidential and Proprietary Technology and Trade Secrets were not disclosed to Integrity during Defendants' exit interviews on January 4 and July 5, as required by their contracts and Plaintiff's standard exit procedures. (*Id.* at ¶¶124, 135, 139, 145, and 152.)

Recognizing that Defendants had breached their contracts and misappropriated Plaintiff's Confidential and Proprietary Technology and Trade Secrets, Plaintiff moved quickly in preparing to file suit. (*Id.* at 168.) While preparing its complaint and the present motion, Plaintiff received on August 20, 2024 at 2:40 P.M. an e-mail from Ross Dillon, Chief Operating Officer of one of Plaintiff's clients, Easton Energy, in which Mr. Dillon informed Plaintiff that Easton would no longer work with Integrity despite Easton's long-lasting business relationship with Integrity, and that Easton was choosing to partner with a different unnamed pipeline consultant. (*Id.* at ¶¶169-171; Ex. I.) The name of this mysterious consultant was conclusively revealed when, ten days later, on August 30, 2024 at 9:33 A.M., Plaintiff incidentally received an e-mail from Mr. Dillon that was addressed to Ms. Cumberland's old Integrity Solutions e-mail address, Meagan.cumberland@integritysolutionsltd.com, and which called out Ms. Cumberland by name in the body of the e-mail and included a troubling subject header titled "Request for Integrity

Information." (*Id.* at ¶¶172-174.) Over the next several days, Integrity continued to receive e-mail correspondence from Easton Energy to Ms. Cumberland's old Integrity Solutions e-mail address, which only confirmed Integrity's suspicions that Ms. Cumberland, through Geo-Prime, is working with Integrity's long-time client Easton Energy and that Easton Energy ended its yearslong business relationship with Plaintiff to work with Ms. Cumberland and her newly launched competitor to Plaintiff, Geo-Prime, LLC. (*Id.* at ¶¶176-183.)

## III.  **LEGAL STANDARD**

"The standards for granting a TRO and a preliminary injunction are generally the same." *Bamba v. Dominion Fin. Servs.*, LLC, No. 24-CV-00826-SKC-NRN, 2024 WL 3340029, at *2 (D. Colo. June 3, 2024), (citing *Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020)). "Temporary restraining orders and preliminary injunctions differ in how long they can last." *Tooele Cnty. v. United States*, 820 F.3d 1183, 1187 (10th Cir. 2016) ("Temporary restraining orders can last no more than fourteen days; preliminary injunctions can last longer.").

"To obtain a preliminary injunction, the moving party must show that (1) it is substantially likely to prevail on the merits; (2) it will suffer irreparable harm without the injunction; (3) this threatened injury outweighs the harm that granting the injunction may cause the opposing parties; and (4) the injunction will not adversely affect the public interest." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899 (10th Cir. 2022), cert. denied sub nom. *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 143 S. Ct. 273, 214 L. Ed. 2d 119 (2022); *see also Ctr. v. Lampert*, 726 F. App'x 672, 674 (10th Cir. 2018); *Salt Lake Tribune Publ'g Co. v. AT & T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003).

While the movant has the burden of establishing each of these factors, "[t]he Tenth

Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement[]" and has "held that where the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success requirement' is somewhat relaxed." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003), (quoting *Otero Sav. & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir.1981) and *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir.2001)); *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781–82 (10th Cir.1964) (same).

## IV.  **ARGUMENT**

This Court's intervention is necessary to protect Plaintiff's intellectual property rights, including its trade secrets, as well as to prevent any further irreparable harm that would occur if Defendants were permitted to continue breaching their contractual obligations. A TRO is further necessary to enjoin the improper and unlawful further distribution—and potentially unlimited distribution—of valuable information key to Plaintiff's pipeline-consulting business that was developed over twenty years and at the expense of over a million dollars. If Defendants' conduct is permitted, Plaintiffs will be subject to ongoing and irreparable harm arising from Defendants' breach of their contractual obligations with respect to non-solicitation, trade secrets, confidential information and work product and Defendants' willful misappropriation of Plaintiff's trade secrets in violation of 18 U.S.C. § 1836 et. seq. and the laws of the State of Colorado, C.R.S. § 7-74-101 et seq.

As explained below, Plaintiff has already been harmed by the loss of a major client, and absent a TRO and preliminary injunction, Plaintiff will suffer irreparable harm which far outweighs the harm that granting the injunction may cause to Defendants, when balancing the equities. Moreover, Plaintiff is substantially likely to prevail on the merits of multiple claims asserted in this lawsuit. Finally, the public interest weighs in favor of injunctive relief. As a

result, Plaintiff respectfully requests that the Court issue the requested injunctive relief and order to show cause.

### A.     *Plaintiff is Likely to Succeed on the Merits of its Claims Against Defendants*

Plaintiff is entitled to injunctive relief if it shows a substantial likelihood of success on the merits of any one of its claims. Indeed, Plaintiff can show that it is substantially likely to prevail on multiple claims for relief.

### 1.     Plaintiff is Likely to Prevail on its Claim for Breach of Defendants' Non-Solicitation Obligations.

#### a.   *The non-solicitation provision is valid and enforceable.*

Ms. Cumberland, Mr. Mader, and Mr. Lindstrom agreed that they would not attempt to solicit or contact Integrity's current, former, or prospective customers. They broke that promise. "An agreement not to solicit customers . . . is a form of an agreement not to compete." *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011). However, one statutorily recognized exception to Colorado's general public policy against noncompete agreements is a non-solicitation clause that is "part of a contract for the protection of trade secrets." *Id.* Both Colorado statute and Colorado courts are clear that such clauses are valid and enforceable. *Id.*; *see also* Colo. Rev. Stat. Ann. § 8-2-113(2)(b)(2) (the prohibition does not apply "if the covenant not to compete is for the protection of trade secrets and is no broader than is reasonably necessary to protect the employer's legitimate interest in protecting trade secrets"). A trade secret "may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo.App.1988).

Here, Ms. Cumberland, Mr. Mader, and Mr. Lindstrom each understood that they would have regular access to Integrity's Confidential and Proprietary Technology and Trade Secrets, including HCA, PFIM, ADM, and SafeSeam. (Verified Complaint, at ¶¶58, 64, and 71.) For that reason, and to protect Plaintiff's rights, Defendants were bound by certain contractual provisions, including a non-solicitation provision, Section 3.05. (*Id.* at ¶¶87-94; Exs. A, C, and E.) Agreement Section 3.05 falls within the trade secrets exception to section 8-2-113(2). Section 3.05 begins with an acknowledgement that the contractors will have access to and learn much about Integrity's customer information, confidential information, and trade secrets. (*Id.* at ¶91); *see Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997) ("[I]t is evident from the preamble to the franchise agreement that the agreement was entered into with the express purpose of protecting trade secrets.") Indeed, this provision recites at length the great competitive value of Integrity's information, the fact that Integrity has leveraged this information and invested substantial resources to develop and preserve its customer relationships and goodwill, and that the loss of any such customer relationship or goodwill will cause significant and irreparable harm to Integrity. (*Id.*); *see Gold Messenger*, 937 P.2d at 911 ("Read in conjunction with the preamble to the franchise agreement, the covenant not to compete precludes franchisee from using the confidential information contained in the manual to compete unfairly against franchisor or other franchisees. Thus, by both its purpose and its scope, the covenant is, in essence, for the protection of trade secrets."). Tellingly, the non-solicitation language here appears only at the very end of Section 3.05, and consistent with Colorado law, is no broader than reasonably necessary to protect Integrity's legitimate interest in protecting its trade secrets. *See Saturn*, 252 P.3d at 527 ("We find it instructive that Saturn included the nonsolicitation

clause within a single confidentiality provision in the Agreement, designed to protect its 'client lists, sales materials, and proprietary information,' thereby expressing an intent to prohibit former employees or independent contractors from using trade secrets to solicit former clients."). Indeed, the prohibition lasts no longer than eighteen (18) months after contract termination. (*Id.*); *see Gold Messenger*, 937 P.2d at 909-10 (finding that the franchise agreement was intended to protect trade secrets and that the **three-year** covenant not to compete was valid).

Moreover, Section 3.05 is unambiguous: While under contract, Ms. Cumberland, Mr. Mader, and Mr. Lindstrom would have access to and become familiar with Integrity's valuable trade secrets, and therefore, each of them agreed that they would not leverage their access to such trade secrets to solicit Integrity's customers, either during the contract period or eighteen months thereafter. (*Id.*); *see Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449 (10th Cir.1973) (applying Colorado law, finding that the agreement (i) not to compete, (ii) not to disclose obtained information, and (iii) not to use obtained information detrimentally was an admission that the information was a trade secret). Agreement Section 3.05 is therefore valid and enforceable under Colorado law. C.R.S. § 8-2-113(2)(b)(2).

### b. Defendants breached their non-solicitation obligations.

Ms. Cumberland, through Geo-Prime and using Plaintiff's Confidential and Proprietary Technology and Trade Secrets, has already poached one of Plaintiff's long-time clients, Easton Energy. (Verified Complaint, at ¶¶169-183.) On August 20, 2024, Easton Energy fired Integrity, an industry-leading 20-year-old pipeline services company, just one month after Ms. Cumberland launched her own competing venture with Mr. Mader and Mr. Lindstrom. (*Id.* at ¶¶169-171.) Ross Dillon, Chief Operating Officer of Easton Energy was unambiguous: Easton

"has decided to partner with a different Integrity consultant moving forward for 2024 into 2025." (*Id.* at ¶169, Ex. I.) Ten days later, on August 30, Integrity would discover that this mysterious consultant is Meagan Cumberland. (*Id.* at ¶¶172-183.)

Likewise, Ms. Cumberland is apparently soliciting Easton Energy's sister company and one of Integrity's other clients, Sentinel Midstream, LLC. (*Id.* at ¶¶101-110.) Indeed, Integrity discovered that Sentinel was sending Plaintiff's confidential project estimates to Ms. Cumberland. (*Id.* at ¶¶101-104; Ex. F.) Ms. Cumberland would have had no legitimate reason to receive project proposals that were generated after her departure from Integrity, and Sentinel Midstream would have had no legitimate reason to send Ms. Cumberland these project proposals, totaling **$598,575**, nearly eight months after her departure. (*Id.* at ¶¶101, 105-109.)

That Sentinel attempted to 'recall' the e-mail to Integrity, suggesting it was sent to Integrity in error, does not change the fact that Ms. Cumberland was clearly the intended recipient. (*Id.* at ¶110; Ex. G.) Indeed, it is unlikely that Sentinel intended to send the e-mail to a different Integrity contractor, and simply included Ms. Cumberland's name by accident, given that Sentinel never bothered to re-send the e-mail to another Integrity contractor after Sentinel attempted to 'recall' it. (*Id.* at ¶100.) Moreover, Shannon Maxwell's inclusion on both the Sentinel Midtream e-mails and sister company Easton Energy e-mails suggests a coordinated attempt to solicit both clients. (*Id.* at ¶¶103 and 179.)

Regardless, Ms. Cumberland's soliciting of Easton Energy and Sentinel Midstream alone breaches Agreement Section 3.05. (*Id.* at ¶91.) Indeed, neither Colorado law nor Agreement Section 3.05 requires Integrity to demonstrate that Ms. Cumberland is *using* Integrity's proprietary and confidential information to solicit Sentinel's business. *See Atl. Bldg. Sys., LLC*

*d/b/a Armstrong Steel Corp., a Delaware limited liability company, Plaintiff-Appellant & Cross-Appellee, v. Cathy Holland-Holtz, Defendant-Appellee & Cross-Appellant.*, No. 23CA1364, 2024 WL 3915869, at *9 (Colo. App. May 16, 2024) ("[T]he noncompete statute does not require an employer to demonstrate that a former employee accessed confidential information after termination for the 'trade secrets' exception to validate a noncompetition or nonsolicitation provision"); *Saturn Sys., Inc.*, 252 P.3d at 527 (finding 'trade secrets' exception applied to non-solicitation provision and that the employer did not need to demonstrate that former employees used employer's confidential information to solicit clients after employee termination). Even so, the circumstances surrounding each Defendant's exit from Integrity, including their unauthorized and undisclosed downloads of Plaintiff's confidential information and trade secrets, only lends further weight in support of a TRO and preliminary injunction.

Ms. Cumberland, through Geo-Prime and using Plaintiff's trade secrets, has already solicited Easton Energy and is actively soliciting another Integrity client, Sentinel Midstream. Accordingly, Ms. Cumberland, and by extension her Geo-Prime compatriots have breached their contractual obligations.

### 2.     Plaintiff is Likely to Prevail on its Claim for Misappropriation of Plaintiff's Trade Secrets.

Under Colorado's Uniform Trade Secrets Act (UTSA), a trade secret is defined as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. Ann. §7-74-102(4).

In determining the existence of a trade secret, courts consider: "(1) the extent to which

the information is known outside the business; (2) the extent to which it is known to those inside the business, such as the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *Atl. Bldg. Sys.*, 2024 WL 3915869, at *8 (citing *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990)).

Moreover, "'misappropriation' is defined in pertinent part as the '[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.'" *Saturn Sys.*, 252 P.3d at 525 (citing § 7–74–102(2)(a)). "'Improper means' includes theft, bribery, misrepresentation, ***breach or inducement of a breach of a duty to maintain secrecy***, or espionage through electronic or other means." *Id.* (quoting §7-74-102(1)) (emphasis added).

### a. Integrity's trade secrets.

Since the start of the company, Integrity has developed and improved a variety of pipeline integrity models, software suites, applications, and tools, which constitute Integrity's Confidential and Proprietary Technology and Trade Secrets. (Verified Complaint, ¶¶19-51.) These include the HCA Software, PFIM Software, ADM Tool, SafeSeam Tool, and Integrity's list of customers including those listed in its activation database. (*Id.* at ¶¶33-44.) Integrity invested over $1,000,000 and hundreds of hours of developer time to initially create these models, software suites, applications, and tools, and Integrity continues to invest significant time and money on maintaining and updating these platforms. (*Id.* at ¶¶31 and 45-50.) Their value to

Integrity can only be described as 'mission-critical' as most of Integrity's primary services to its clients, and indeed Integrity's continued operation, would be impossible without them. (*Id.* at ¶¶49-51.)

### b. Defendants have misappropriated Integrity's trade secrets.

In the course of their duties, Defendants had access to Integrity's Confidential and Proprietary Technology and Trade Secrets, and therefore, as part of the exit process, were contractually obligated to disclose, return, and delete all materials in their possession. (*Id.* at ¶93; Ex. A, C, and E, Section 4.03.) Instead, Defendants downloaded programs, tools, software applications, databases, and documents, including Integrity Trade Secrets in the weeks and days leading up to their departures, and did not return or disclose them to Integrity. (*Id.* at ¶¶117-167.) Indeed, Defendants downloaded some Integrity Trade Secrets *after* giving Integrity notice of their departure. (*Id.* at ¶166.)

Many of these programs, tools, software applications, databases, and documents include customer information, customer lists, and other information that has never been made available to anyone outside of Integrity. (*Id.* ¶¶117-167.) Moreover, some materials, such as Integrity's internal Microsoft® database (.mdb) containing all license codes for PFIM Software versions 3.5 and 4.0, are essential to Integrity's ability to exclusively control its Confidential and Proprietary Technology and Trade Secrets. (*Id.* at ¶¶149-167.) Likewise, Defendants downloaded old software versions that were no longer being used by Integrity, but which are nevertheless valuable, in that they were built on a foundation of previous versions of Integrity's software and contain multiple layers of risk algorithms and metadata for multiple pipeline asset classes that Integrity developed over its entire existence as a company and which are informed by Integrity's

collective work for both current and former customers over the years. (*Id.* at ¶¶125-139.) Moreover, some downloaded materials include about 90% of the functionality and features of Integrity's current platform offerings to its own clients, only further risking disclosure of additional Confidential and Propriety Technology and Trade Secrets. (*Id.* at ¶130.) Tellingly, Defendants' new venture, Geo-Prime, is purporting to offer complex pipeline integrity services that necessarily require or rely on tools and software applications that are the same as or similar to Plaintiff's proprietary technology. (*Id.* at ¶¶74-84.)

Integrity's Confidential and Proprietary Technology and Trade Secrets took years to create and develop. The notion that Defendants managed to create their own programs, tools, software applications, databases, and process documents in a single month defies belief. Moreover, Defendants' collective failure to comply with Plaintiff's exit procedures speaks volumes. Had Defendants downloaded these materials for a proper purpose within the course of their then-existing duties, surely, they would not have obscured these downloads from Integrity at their exit interviews. In doing so, Defendants breached their contractual obligations and duties of secrecy and non-disclosure. Accordingly, under Colorado law, Integrity is substantially likely to succeed on the merits of its claims that Defendants have misappropriated and acquired via improper means, Integrity's Trade Secrets.

**B.** ***Integrity Stands to Suffer Irreparable Harm If Defendants Are Allowed To Continue To Use Integrity's Own Software to Lure Away Integrity's Customers.***

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (quoting *Dominion*

*Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir.2001)); *see also Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial.").

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Bamba*, 2024 WL 3340029, at *3 (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Bamba*, 2024 WL 3340029, at *3 (internal quotations omitted).

Defendants already agreed that Integrity would suffer irreparable harm in the event of Defendants' breach of their contractor agreements, and that Integrity would be entitled to a temporary restraining order, temporary injunction, and permanent injunction in the event of a breach. (Verified Complaint, at ¶94.) As already described above and throughout Plaintiff's Verified Complaint, Defendants have breached several contract provisions. Indeed, Plaintiff's harm is not only certain and great, but it has also already occurred and continues to occur. Evidence has been adduced that Defendants have taken one of Integrity's clients, Easton Energy, and are in apparent contact with another, Sentinel Midstream, thus breaching their non-solicitation obligations. Furthermore, as described above, Defendants have breached their duties of secrecy, non-use, and non-disclosure, misappropriating Integrity's Confidential and Proprietary Technology and Trade Secrets, and deliberately obscuring such activity from Integrity during the exit interview process.

Monetary damages are inadequate to compensate for the irreparable harm suffered by

Integrity as a result. For example, Integrity's deprivation of future recurring business from Easton and Sentinel, and the value of Integrity's ability to exclusively control its proprietary materials, is incalculable. Likewise, the value of PFIM software version 3.5, one of Defendants' undisclosed downloads, is difficult to calculate, since it is built on a foundation of previous versions of Integrity's software and contains multiple layers of risk algorithms and metadata for multiple pipeline asset classes that Integrity developed over *its entire existence* as a company. (*Id.* at ¶¶127-130.) The discrete value of each of these algorithms, asset class data points, untold amounts of work product, and Integrity's former and current client interactions is not ascertainable.

Moreover, given that Defendants are already servicing Easton Energy, are advertising similar pipeline integrity services, and are in possession of Integrity's technology and materials on which those services are based, it is very likely that Defendants are already leveraging Integrity's Confidential and Proprietary Technology for Geo-Prime's benefit. At minimum, this represents imminent if not active harm to Integrity. Accordingly, the irreparable harm caused to Integrity and the inadequate remedies available under the law to address that harm strongly favor a TRO and preliminary injunction.

### C.     *The Balance of Equities and the Public Interest Weigh Heavily in Favor of a Temporary Restraining Order.*

The balance of equities and the public interest heavily favor Plaintiff. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The temporary restraining order is limited in scope. It does nothing more than preserve the status quo and ensure that the Defendants do not take steps contrary to their agreements or Plaintiffs' ownership interests in its software and technology.

Indeed, courts have found that the public "has a strong interest in holding private parties to their agreements." *See Epic Games v. Apple Inc.*, 2020 WL 5073937, at *4 (N.D. Cal. Aug. 24, 2020). Further, Defendants will not face any legitimate harm due to the requested relief, which seeks only to prevent Defendants from making use of or selling software or services which derive from Plaintiff's intellectual property and trade secrets.

Absent an injunction from this Court, Plaintiff might forever lose their control and ownership interest in their intellectual property and trade secrets. (Verified Complaint, ¶¶45-51.) Plaintiff has spent years and countless hours creating and developing its Trade Secrets, including its software suites, data tools, and work product. It has invested substantial knowledge and know-how, informed by its collective work for clients both past and present, into these platforms. Plaintiff has spent years building its reputation and amassing goodwill among its peers, partners, and clients in the industry. In contrast, Defendants' new venture, Geo-Prime, LLC, has only existed for several months, and only began business in July of 2024. Whatever effect a temporary restraint would have on Defendants pales in comparison to the irreparable harm that has been and would continue to be suffered by Plaintiff. In short, preserving the status quo during the pendency of this action is the most equitable outcome.

V.    **CONCLUSION**

Plaintiff is at risk of immediate and irreparable harm from Defendants and is substantially likely to succeed on its claims. The Court should grant Plaintiff's motion for a temporary restraining order and order to show cause. The Court should grant these requests *ex parte* and without advance notice to Defendants to preserve the *status quo* and permit the Court to grant effective relief on the merits of Plaintiff's claims.

For the foregoing reasons, Plaintiffs respectfully request that the Court issue:

(1)     A temporary restraining order enjoining Defendants from soliciting Plaintiff's oil and pipeline operator clients and their business;

(2)     A temporary restraining order enjoining Defendants from directly or indirectly making use of any of Plaintiff's proprietary materials, including trade secrets;

(3)     A temporary restraining order enjoining Defendants from distributing or disclosing any of Plaintiff's proprietary materials, including trade secrets to any third party;

(4)     A temporary restraining order enjoining Defendants from selling any product or service derived in whole or in part from Plaintiff's proprietary materials, including trade secrets; and

(5)     An Order to Show Cause as to why a Preliminary Injunction should not be entered under the circumstances, pursuant to Fed. R. Civ. P. 65, enjoining Defendants from directly or indirectly committing the above-described acts during the pendency of this action.

DATED:  September 12, 2024

                                    _/s/ Isaac Crum_____
                                    Isaac S. Crum
                                    Gregory P. Sitrick
                                    Sharif S. Ahmed (*pro hac vice* forthcoming)
                                    **MESSNER REEVES LLP**
                                    7250 N. 16th St., Suite 410
                                    Phoenix, Arizona 85020
                                    Telephone: (602) 457-5059
                                    Facsimile: (303) 623-0552
                                    gsitrick@messner.com
                                    icrum@messner.com
                                    sahmed@messner.com

                                    **ATTORNEYS FOR PLAINTIFF
                                    INTEGRITY SOLUTIONS, LTD.**

### TYPE-VOLUME CERTIFICATION

I hereby certify that the foregoing Memorandum of Points and Authorities is **5,445** words, excluding the caption and signature block, and therefore complies with the **5,500** type-volume limitation for preliminary injunction motions, as set forth in Judge Tymkovich Civ. P.S. II(A)(1) or Judge Domenico's Practice Standard III(A)(1).

                                    _____/s/ Isaac Crum_____
                                    Isaac S. Crum