IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02519-SKC-NRN

INTEGRITY SOLUTIONS, LTD,

Plaintiff,

v.

MCS CONSULTING, INC.;
ENERGY SYSTEMS CONSULTING, LLC;
MAKERS SOLUTIONS, LLC;
GEO-PRIME LLC;
MEAGAN CUMBERLAND;
JOEL LINDSTROM; and
KYLE MADER,

Defendants.

# ORDER ON DISCOVERY DISPUTE

**N. REID NEUREITER**
**United States Magistrate Judge**

## I. BACKGROUND

This is a civil action for breach of contract and misappropriation of trade secrets. The lawsuit is brought by Plaintiff Integrity Solutions, LTD ("Plaintiff") against a number of former employees/contractors and the companies they formed since they stopping working for Plaintiff.

Plaintiff provides management services and software solutions to the United States' oil and gas pipeline industry. It assists pipeline operators with services such as pipeline regulatory compliance, risk management, and integrity analysis. Plaintiff says it collects client data, integrates and analyzes it using proprietary software, and generates

performance findings and improvement recommendations to aid pipeline operators in their asset management and regulatory compliance decisions. Plaintiff asserts that to assist pipeline operators, it has created and developed some of the first industry-leading pipeline facility risk models and integrity analysis software suites, applications, and database tools, which Plaintiff claims as its trade secrets in this case.

This matter came before the Court for a discovery dispute on April 8, 2025. *See* ECF No. 63 (Minutes of Discovery Dispute Hearing). Consistent with the Court's practice standards, the Parties submitted their Joint Discovery Dispute Statement in advance of the hearing. The Court decided certain of the disputed issues from the bench at the April 8, 2025 hearing. Two issues were taken under advisement. This Order addresses those discrete issues.

II. **ANALYSIS**

   a. **Issue #1-- Designation of Plaintiff's Trade Secrets as merely "Confidential" or "Attorneys' Eyes Only"?**

      i. **The Parties' Arguments**

First is the question of whether Plaintiff's production of allegedly trade secret information, necessary to demonstrate what trade secrets Defendants allegedly stole, should be labeled as merely "confidential" under the Stipulated Protective Order in this case, or instead, as Plaintiff insists, it should be "Restricted—Attorneys' Eyes Only" ("AEO"), which would prevent Defendants from seeing what Plaintiff claims are the trade secrets at issue. The AEO designation would allow Defendants to share the information with retained experts but prevent them from seeing and understanding what it is they are accused of stealing or meaningfully discussing those materials with their counsel. The Stipulated Protective Order allows for documents produced in discovery to be

2

designated as "CONFIDENTIAL" or "RESTRICTED - ATTORNEYS' EYES ONLY." *See* ECF No. 43 ¶ 1. The Protective Order also allows for certain materials documents to be designated "RESTRICTED CONFIDENTIAL SOURCE CODE," to which additional restrictions apply. *Id.* at ¶ 7.

### ii. Decision on Issue #1

Generally, the analysis for determining whether to issue a protective order or to retain an attorney's-eyes-only designation is the same. *See In re Michael Wilson & Partners, Ltd.*, No. 06-cv-02575-MSK-KLM, 2007 WL 3268475, at *2–3 (D. Colo. Oct. 30, 2007). The decision to issue a protective order rests within the sound discretion of the trial court. *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990). Such protection is warranted, upon a showing of good cause, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," and can include an order "that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." Fed. R. Civ. P. 26(c)(1)(G). In determining the proper level of protection, the Court must balance the requesting party's need for the discovery against the resisting party's claimed harm that will result from disclosure. *See Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981).

To carry the good cause burden under Rule 26(c)(1)(G), a party must first establish that the information is a trade secret or other confidential research, development, or commercial information and then demonstrate that its disclosure might be harmful. *A Maj. Difference, Inc. v. Wellspring Prods., Ltd. Liab. Co.*, 243 F.R.D. 415, 416–17 (D. Colo. 2006) (citing *Centurion Indus*, 665 F.2d at 325–26).

3

The burden is on the party resisting discovery or dissemination to establish that the information sought should be subject to additional protection. *In re Michael Wilson & Partners, Ltd.*, 2007 WL 3268475, at *2 (citing *Reed v. Nellcor Puritan Bennett*, 193 F.R.D. 689, 690 (D. Kan. 2000)). To meet this burden, the moving party must set forth specific facts showing good cause, not simply conclusory statements. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981). Thus, Plaintiff must do more than simply allege that the confidential materials are trade secrets. *S.E.C. v. Misner*, No. 07–cv–01640-REB-MEH, 2007 WL 3232132, at *3 (D. Colo. Oct. 30, 2007) (citing *Reed*, 193 F.R.D. at 691); *see also JTS Choice Enters., Inc. v. E.I. Du Pont De Nemours & Co.*, No. 11-cv-03143-WJM-KMT, 2013 WL 791438, at *2 (D. Colo. Mar. 4, 2013).

In a trade secret case, "[t]here is no privilege excepting trade secrets from discovery, but 'courts must exercise discretion to avoid unnecessary disclosures of such information.'" *Dura Global Techs., Inc. v. Magna Donnelly, Corp.*, No. 07–cv–10945, 2007 WL 4303294, at *2 (E.D. Mich. Dec. 6, 2007) (quoting *Automeds Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 925 (N.D. Ill. 1974)). As such, the "[p]laintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed . . . to compel discovery of its adversary's trade secrets." *Id.* (quoting *Automeds*, 160 F. Supp. 2d at 926); *see also Gentex Corp. v. Sutter*, No. 3:07–cv–1269, 2008 WL 5068825, at *1 (M.D. Pa. Nov. 25, 2008); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-cv-02868-MSK-KMT, 2011 WL 10858409, at *3 (D. Colo., Oct. 12, 2011).

If the material is a trade secret worthy of protection, the Court must then determine the proper level of protection warranted. *Netquote, Inc. v. Byrd*, No. 07-cv-

00630-DME-MEH, 2007 WL 9814460, at *1–2 (D. Colo. Oct. 31, 2007). In other words, if the material is a trade secret, the Court must determine whether a confidential designation will be adequate protection from unwarranted dissemination or whether it is necessary to actually keep the information secret from an adversary litigant by restricting access to only its lawyer and experts. Confidential information that could be used against the company by a direct competitor in the lawsuit may be afforded the higher level of protection. *See A/R Roofing, L.L.C. v. CertainTeed Corp.*, No. 05-1158-WEB, 2005 WL 6794228, at *2 (D. Kan. Dec. 5, 2005) (approving AEO designation of certain "highly sensitive" pricing information but declining to approve protective order that would allow a party to designate other information beyond pricing information as AEO); *Zenith Radio Corp. v. Matsushita Electric Indus. Co.*, 529 F. Supp. 866, 890 (E.D. Pa. 1981) ("[c]ompetitive disadvantage is a type of harm cognizable under Rule 26").

As Judge Tafoya explained in *L-3 Communciations*, the threshold disclosure requirement by the plaintiff of discovery in trade secret cases serves several purposes. First, describing a trade secret with specificity puts the defendant on notice of what it has allegedly misappropriated. *L-3 Commc'ns*, 2011 WL 10858409, at *1. Second, this requirement prevents disclosure of trade secrets that were not misappropriated by the defendant, thereby giving the plaintiff access to trade secret information that it would otherwise be illegal for the plaintiff to misappropriate. *Id.* And third, "'requiring the plaintiff to state its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives.'" *Id.* (quoting *DeRubeis v. Witten Techs., Inc.*, 244 F. R.D. 676, 681 (N.D. Ga. 2007)).

5

Here, Defendants' counsel argue that they must be allowed to share and discuss Plaintiff's claimed trade secrets with their clients, which the AEO designation would prevent. Only their clients will be able to intelligently assess Plaintiff's claimed trade secrets and advise their counsel as to whether the information is *really* secret or instead common knowledge in the industry. An AEO designation prevents that dialog from happening and interferes with the fairness of the process; Defendants need to know what it is they are accused of stealing. And, Defendants argue, the AEO designation prohibiting the Defendants from seeing what they have supposedly stolen makes no logical sense. To the extent they were doing work for Plaintiff previously, they have already been exposed to the trade secrets and, to the extent they are accused of stealing those secrets, Plaintiff seems to be alleging they already have possession and knowledge of those secrets. So an AEO designation only serves to unfairly prohibit the Defendants from defending themselves from the accusations of theft.

The Court is persuaded by the reasoning articulated by Judge Kristen L. Mix in the case of *Innovatier, Inc. v. Cardxx, Inc.*, No. 08-cv-00273-PAB-KLM, 2008 WL 4889867 (D. Colo., Nov. 13, 2008), where she was faced with a similar dilemma of one party seeking to limit disclosure of claimed trade secrets via an AEO designation. Judge Mix found the proposed limitation both unfair and impractical. As she explained, "building an impermeable wall around this information by means of a Protective Order is not only impractical, but would be crippling to Defendant's efforts to adequately present its case." *Id.* at *2. Judge Mix continued,

> In order to absolutely prevent Defendant's representatives from having access to the information at issue, they would necessarily be excluded from every discussion of the information essential for presentation of Defendant's legal arguments and evidence to the Court or trier of fact. The implications

6

>   of Plaintiff's proposal are far reaching and would serve to prohibit
>   Defendant's representative from participating in preparation for key
>   depositions, strategizing about important motions, and attending the trial.
>   The wall around the information would also operate as a wall between
>   Defendant and its counsel. Moreover, the task of policing the wall would, of
>   course, fall eventually to the Court, which would increase the cost of the
>   litigation for both parties and unduly burden the Court.

*Id.*

Likewise, the Court here concludes that Plaintiff's alleged trade secret information should be designated as "CONFIDENTIAL" only; not restricted as "ATTORNEYS EYES ONLY." Plaintiff has brought this lawsuit claiming its trade secrets have been stolen. It is important for the fairness of the process that Defendants know exactly what it is that they have been accused of stealing. And, to the extent Plaintiff is correct—that Defendants already have access to and are deploying the alleged trade secrets—then an AEO designation provides little help. Maintaining the information as "CONFIDENTIAL" and making clear that any confidential information should not be used for any purpose other than this litigation, should provide sufficient protection.

### b. Issue #2: Defendants' Response to Plaintiff's Request for Production #5 to Defendant Geo-Prime, LLC

#### i. The Parties' Arguments

The second issue is Plaintiff's Request for Production ("RFP") #5 to Defendant Geo-Prime, LLC ("Geo-Prime") which seeks production of "all Source Code for each and every software, suite, application, tool, feature and functionality used in connection with the services provided or offered by Geo-Prime, LLC, including all developer comments, revision histories of Source Code with associated comments, the source code used in connection with the services provided or offered by Geo-Prime."

Geo-Prime objects on the grounds that the request is vague, ambiguous, overly broad, and unduly burdensome. In addition, Geo-Prime asserts that the request is "premature" and constitutes an impermissible "fishing expedition" for information that will be costly to produce and is not necessary for resolution of the matter. *See* ECF No. 63-3 at 10–11. Geo-Prime also complains that Plaintiff has not sufficiently identified its own trade secrets with particularity so that Defendants and the Court can "ascertain the proportionality of Plaintiff's requests for Defendants to produce their own trade secrets and proprietary materials." *Id.* at 6–7.

### ii. Decision on Issue #2

Per the Amended Complaint, Geo-Prime is Plaintiff's direct competitor and formed by the Individual Defendants Cumberland, Mader, and Lindstrom after they stopped working for Plaintiff. ECF No. 20 ¶¶ 74–75. On its LinkedIn.com 'About' page, Geo-Prime advertises that it "provides a wide range of services including CFR 192 and 195 regulatory compliance and integrity management program support along with spatial analysis services and data management." *Id.* ¶ 76. According to the Amended Complaint, "Geo-Prime advertises the same services as Plaintiff, and boasts that it creates value for its clients 'by leveraging experience with proven analysis methods to solve complex problems.'" *Id.* ¶ 78.

The Amended Complaint identifies specific software tools or programs that Plaintiff has developed which Plaintiff claims as its trade secrets, such as the HCA Software, the PFIM Software, the ADM Tool, the SafeSeam Tool, and Plaintiff's activation database. *Id.* ¶¶ 33, 117.

8

Plaintiff alleges that Defendant Cumberland, in her final 60 days working with Plaintiff, downloaded nearly 20,000 files from Plaintiff's cloud server. And one month before her exit interview, she downloaded Plaintiff's in-house, non-commercial SafeSeam tool files, including files used in the installation and execution of SafeSeam. *Id.* ¶ 119–21.

Plaintiff also alleges that, just days after Geo-Prime was registered with the Texas Secretary of State's office, Defendant Lindstrom, who was still working with Plaintiff at the time, downloaded Plaintiff's internal Microsoft database file for the PFIM Software Version 3.5 Setup Database, which is used to run a version of Plaintiff's proprietary PFIM 3.5 software. *Id.* ¶¶ 125–29. The next day, Lindstrom is alleged to have downloaded Plaintiff's internal Word document titled "PFIM Documented Changes v34 and v35 (2018-10-01)," which documents PFIM software updates. *Id.* ¶136. Lindstrom is also alleged to have retained approximately 79 analysis scripts, including python source code files, related to the GIS software, which scripts he was hired to write for Plaintiff. Plaintiff asserts that it took Lindstrom more than a year to build these tools for the Plaintiff, yet in July 2024, the month Geo-Prime began operating, Lindstrom began advertising on LinkedIn.com that Geo-Prime was providing services based on these tools. *Id.* ¶ 141

With respect to Mader, Plaintiff alleges that just three weeks before his own departure from Plaintiff's employ, Mader downloaded the ADM Software Version 1.42 Installation and Executable Files; PFIM Software Version 3.5 Installation and Executable Files; and Plaintiff's internal Word document titled "PFIM_GIS_management," which documents the process for integrating HCA Software

9

data from the GIS software in the PFIM Software platform. *Id.* ¶¶ 142–44. The downloaded Word document allegedly details the process for integrating the undisclosed HCA Software data Cumberland downloaded from the GIS software Lindstrom was hired to develop for Plaintiff, within the PFIM software platform that both Lindstrom and Mader downloaded. *Id.* ¶148.

Although in its Amended Complaint, as described above, Plaintiff appears to have identified generally those products, tools, and files that it believes constitutes its misappropriated trade secrets, the Court agrees with Geo-Prime that, as written, RFP #5 is overbroad and not calculated to be proportionate to the issues in the case. The demand for production of "all Source Code for each and every software, suite, application, tool, feature and functionality used in connection with the services provided or offered by Geo-Prime, LLC" is excessive and not meaningfully targeted at specific services or software tools that Plaintiff has reason to believe Geo-Prime has expropriated. As written, Plaintiff's overbroad request constitutes a fishing expedition. It can be characterized as, "Give us everything you do or use in your business so that we can analyze it and determine whether it may have been derived from our trade secrets." This is overreach.

Therefore, Geo-Prime's objection to this request is **SUSTAINED** without prejudice to Plaintiff identifying with more particularity which specific services or software tools it believes Gro-Prime is offering that Plaintiff can reasonably tie to its claimed misappropriated trade secrets. If Plaintiff were to do that and seek just the

source code or scripts for those services or tools, then Geo-Prime's objection would likely be overruled.

Dated this 25th day of April, 2025.   BY THE COURT:

N. Reid Neureiter
United States Magistrate Judge